UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.: 3:24-cv-12281-KAR

| | |
|---|---|
| RYAN OLSZTA, *Plaintiff*. | ) ) ) |
| v. | ) ) |
| TOWN OF BRIMFIELD, SUZANNE COLLINS, HAROLD LEAMING, MICHAEL MILLER, GEORGE ADAMS, And CHIEF WILLIAM J. BEAUDRY *Defendants*. | ) ) ) ) ) ) |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF**

NOW COMES the Plaintiff, Ryan Olszta ("Plaintiff"), hereby submits this Response to the Defendants' Supplemental Brief in support of their Motion to Dismiss the Plaintiff's Complaint. The Plaintiff states the foregoing in support of his Opposition.

**I.   THE PLAINTIFF HAS SHOWN "GOOD CAUSE" FOR HIS UNTIMELY SERVICE**

Mass. R. Civ. P. 4 governs how proper service shall be executed for all Civil matters subject to the Commonwealth's jurisdiction. *Mass. R. Civ. P. 4*. "Timely service" is made when the Defendant is properly served within ninety (90) days of the date of the Complaint's filing. *Mass. R. Civ. P. 4(j)*. Should the Plaintiff fail to do this, the Defendant is entitled to dismissal without prejudice **except** for a showing of "good cause." *Id*. In this context, the Court has noted that "good cause" is a narrow definition which applies where the Plaintiff (or his attorney acting therefor) has made a "diligent" yet unsuccessful attempt to properly effectuate timely service.

*Shuman v. Stanley Works*, 30 Mass. App. Ct. 951, 953 (1991) citing *Davis-Wilson v. Hilton Hotels Corp.*, 106 F.R.D. 505, 509 (E.D. La. 1985).

Therefore the Plaintiff's actions taken to make proper service become relevant to a "good cause" inquiry. *Id* citing *Quann v. Whitegate-Edgewater*, 112 F.R.D. 649, 659 (D. Md. 1986). There needs to be deliberate reasonable and diligent steps taken to ensure that the Defendant is properly served and henceforth notified of the claims against him. *Id*. See *Hull v. Attleboro Sav. Bank*, 33 Mass. App. Ct. 18, 26 (1992) (There can be no good cause where the Plaintiff could not show that they made any attempts to serve Defendant at all); *Pantos v. Zarony*, 2015 Mass. App. Unpub. LEXIS 623 at 4 (There is no good cause shown where the Plaintiff could not definitely determine where the Defendant's actually resided).

*Shuman*'s facts and issues are analogous to this instant matter, given that in both instances the Plaintiff claims that the untimely service was due to the Constable's inaction(s) rather than his own unreasonableness. See Generally *Shuman*, 30 Mass. App. Ct.. The Court found that the Plaintiff in *Shuman* did not act "reasonably" nor "diligently" and thus could not accredit the Constable's failures as a showing of "good cause." *Id* at 953. The distinction between *Shuman* and this matter is Shuman's failure to act until the deadline, or adequately address it. *Id*. Shuman's did not attempt to effectuate service until eight (8) days before the ninety (90) day deadline, and further failed to request an extension from the Court. *Id*. Hence, the Constable could not be the negligent actor, given the lack of time afforded to him to effectuate service properly.

The Defendants seek to dismiss all claims against them due to the Plaintiff's untimely service. Each of the Defendants were served one day after the extended deadline, with the one exception being Defendant Harold "Pat" Leaming ("Leaming"). The Plaintiff admittedly did

brush up against the ninety (90) day deadline, however they also diligently filed for a thirty (30) day extension, which was subsequently granted. Regardless of why they brushed up against the deadline is utterly irrelevant given that they acted reasonably and timely to ensure that they were in compliance with Mass. R. Civ. P. 4(j).

Soon thereafter, the Plaintiff took the requisite steps, namely the use of a Private Investigator to conduct a brief investigation, to locate the Defendants' last known addresses to actually effect service properly upon them. All but one of these addresses were accurate (the exception being Leaming). The Plaintiff mailed out service the day he received the summonses from the Court (August 5, 2024), and the Defendants were not served by the Constable until August 20th, one day after the extended deadline.

Unlike *Shuman*, the Plaintiff acted diligently and reasonably given his situation. *Shuman* failed to address the initial ninety (90) deadline, and waited until a week before the deadline to mail out service to the Constable. Mr. Olszta conversely meaningfully addressed the deadline by asking for, and receiving, the thirty (30) day extension. He further mailed out service with sufficient enough time for the constable to timely serve the Defendants. However the constable, even with that amount of time, failed to do so. The Plaintiff diligently addressed whatever was reasonably in his control, and took the reasonable steps to address those issues. Hence there was "good cause" for his failure to make timely service.

## II. CHIEF BEAUDRY'S ACTIONS WERE IN VIOLATION OF THE SECOND AMENDMENT PER *BRUEN* and *RAHIMI*

In *Bruen*, the Supreme Court held that for any statute or regulation that seeks to regulate the possession or use of firearms to be in keeping with the Second Amendment, it must be consistent with "this Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022). Whether the regulation itself exists in service of an

"important government interest" is not enough to justify the law's restriction. *Id*. The Court noted that its holding was a departure from the previously often used "interest balancing test." *Id*. This new "historical tradition" means of analyzing a statute for its Constitutionality is more in keeping with the Framer's goals inherent to the Second Amendment. *Id*. An "interest balancing" test would be paradoxical given that the Second Amendment "is the very *product* of an interest balancing by the people" and hence places the interest of self-defense above all other public interests. *District of Columbia v. Heller,* 554 U.S. 570, 635 (2008).

Therefore, any regulation that burdens the citizenry with restriction on their ability to possess or use firearms must be comparable to a historically existing ordinance. *Mcdonald v. Chicago*, 561 U.S. 742, 767 (2010) quoting *Heller*, 544 U.S. at 599. It is generally understood and recognized that responsible law abiding individuals are "allowed" to enjoy their right to possess a firearm. *United States v. Rahimi*, 602 U.S. 680, 700 (2024). The "mentally ill" and "felons" are precluded from this right, even if they are in the private confines of their own home. *Id* at 699 citing *Heller*, 554 U.S. at 626-27, n.26. The Court has even further clarified that an individual who has been found to pose a credible threat to another private citizen, or the general public, is a traditionally valid reason to "de-arm" someone. See *Id* at 694 (Surety and "going armed" laws were pre existing ordinances developed in colonial-era England to justify the disarmament of citizens who posed a domestic or public threat).

Harassment Prevention Orders (M.G.L. c. 258E) ("HPOs") and Extreme Risk Prevention Orders (M.G.L. c. 140, §131R) ("ERPOs") are justified by that same rationale. Both ordinances exist to preclude individuals who may pose a public threat from possessing firearms (or the licensure therefore). *M.G.L. c. 140, §131(d)*. Part of a law enforcement officer's responsibilities

henceforth is to enforce any HPO or ERPO in place, in part by seizing a Respondent's license to carry ("LTC") and any and all firearms in his possession. *Id*.

In their supplemental brief, the Defendants argue that the procedures outlined in M.G.L. c. 140, §131 were properly followed by Chief Beaudry, and henceforth he is shielded from liability through Qualified Immunity. In reality it was the Plaintiff himself who failed to follow the remedial steps afforded to him, and thus, as a matter of law, he must be precluded from bringing suit for a violation of his Second Amendment rights. However the facts do not support that theory, and actually beg the question as to how constitutional were the actions taken by government actors who were involved in seizing the Plaintiff's LTC and firearms.

The factual basis for the seizure is two fold: 1) pursuant an HPO filed by Defendant Suzanne Collins ("Collins"), and 2) pursuant an ERPO filed by Chief Beaudry upon information he "received" via an affidavit forwarded to him by the Plaintiff's uncle. In both instances, the orders were dismissed by the Courts (respectively on constitutional and factual grounds) obligating Chief Beaudry to return the Plaintiff's LTC and firearms, which he failed to do. The HPO was originally filed by Collins, with Chief Beaudry's assistance, alleging that on three separate instances the Plaintiff had given her "the middle finger" while in public. The HPO was initially granted, but ultimately dismissed citing the Plaintiff's First Amendment rights to engage in such public expression.

Concurrent to this was a coordinated effort between the Town of Brimfield's Board of Selectmen ("Board"), of which Collins is a member, who tasked Chief Beaudry with filing an ERPO against the Plaintiff to justify their seizure of his LTC and firearms. Their basis was found in complaints filed in the Plaintiff's personnel file, which were dated after the date of his termination as a patrolman. The Plaintiff contends that many of said complaints begin with

phrases akin to "[t]his is what 'Marty' asked for." "Marty" being Martin Kelly ("Kelly") the Boards Chairman. The prior chief of police, Chief Kuss, represented to the Plaintiff that Kelly had been soliciting complaints to file into his personnel folder.

Needing some factual basis to fulfill this task, Chief Beaudry reached out to the Plaintiff's estranged uncle ("Uncle") for the necessary material (It should be noted that the Plaintiff and his uncle have a long and strained history, which includes allegations of sexual abuse and neglect, which the Plaintiff had previously disclosed to Beaudry). The Uncle had filed a complaint with the Town roughly a year prior where he alleged that at the age of fifteen (15) the Plaintiff had been involuntarily committed to a psychiatric institution, had frequently falsified police reports and search warrants so he conduct home searches and raids, used taser on random civilians, and had pointed a loaded firearm at his mother's head. Chief Kuss had originally looked into the Complaint and spoke with the Uncle. He determined that the allegations were fallacious and could not be supported.

After having spoken with Chief Beaudry, the Uncle opted to file for an ERPO. The Uncle produced a handwritten letter to Chief Beaudry stating that the Plaintiff had suffered a long standing chronic bout with mental illness, specifically Post-Traumatic Stress Disorder ("PTSD") stemming from his time in the military. Chief Beaudry used this letter, without any further corroborative documentation (including medical records) to seek and obtain an ERPO, granting him the justification to seize the Plaintiff's LTC and firearms. The case was eventually dismissed due to the lack of sufficient facts, which entitled the Plaintiff to receive back his LTC and firearms. During his testimony in a later hearing, the uncle stated that Beaudry had "sought him out" and advised him to file for the ERPO. Despite the dismissal, Chief Beaudry refused to return them back to the Plaintiff.

The Plaintiff is not challenging the specific statute invoked to justify the seizure, but argues that both the Town's and Chief Beaudry's actions were extra judicious. Using the *Bruen* and *Rahimi* standards, there is no conceivable way to claim that his actions fell within the purview of his responsibilities and duties as a law enforcement officer or were commensurate with the Second Amendment. While it is lawful for a state or municipal entity to seize a private citizen's firearms due to being a threat to another private citizen or the general public, implicit in that is an underlying factual basis for that extreme action. The allegations levied against the Plaintiff were previously investigated by Chief Kruss, who found them unsubstantiated. Nevertheless, those allegations were the jumping off point to provide pretext to remove the Plaintiff's Second Amendment rights. It is not in keeping with the intent (in fact it directly contradicts said intent) to *ad hoc* conspire to seize a private citizen's firearms and then *post hoc* find the factual basis.

The burden ultimately rests on the governmental entity enforcing this action to provide the historical analogue and articulate the policy or value basis for the Board's actions. *Rahimi*, 602 U.S at 691. To date the Defendants have not presented to this Honorable Court such an analogue. Therefore, the Plaintiff's current claim(s) under the Second Amendment should not be dismissed and be allowed to continue.

### III.  THE PLAINTIFF HAS A RIGHT FOR HIS EMPLOYMENT DISCRIMINATION ACTION TO BE HEARD

The Fifth Amendment protects a private party's right to "be heard" in a meaningful manner pursuant the value of "due process." *Lion Elastomers, L.L.C. v. NLRB*, 108 F.4th 252, 260 (2024) quoting *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). Under §1983, any private citizen can bring a cause of action against another party for

depriving them of their constitutional rights. *42 USCS § 1983*. Included in those causes of action pursuant § 1983 is the right to not be treated disparately in an employment context due to one's sexual orientation. See Generally *King v. Me. Dep't of Corr..*, 2015 U.S. Dist. LEXIS 58467 (Plaintiff had supported the claim that her employer, the Maine Department of Corrections, disciplined her due to her sexual orientation). This behavior is the same type of behavior that is explicitly made unlawful by M.G.L. c.151B ("for an employer….because of…sexual orientation…to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification). *M.G.L. c.151B, §4(1)*.

The Plaintiff does not dispute the Defendants' factual allegations pertaining to proper notice and MCAD's finding that there was a "lack of probable cause" to support his claims. However, he does assert that the MCAD process is insufficient on the basis of Due Process. The "probable cause" finding was made by a governmental body and was made pursuant to their investigation of another governmental body. Hence, the Plaintiff contends that in the interest of Due Process and Fair Justice his claims should be reviewed by an impartial body by seeking relief through the Article III process, the US Federal Courts, as is his right under the Constitution.

## **CONCLUSION**

WHEREFORE, the Plaintiff humbly and respectfully requests that this Honorable Court reject the Defendants' Supplemental brief for the aforementioned reasons.

Respectfully submitted,<br>
RYAN OLSZTA<br>
Plaintiff<br>
Through their attorney,

*/s/ Andrew J. Couture, Esq.*
Andrew J. Couture, Esq. BBO#: 671193
The Law Office of Andrew J. Couture
77 Merriam Avenue
Leominster, MA, 01453
(978) 502-0221
attycouture@gmail.com

DATED: February 7, 2025

## CERTIFICATE OF SERVICE

    I hereby certify that the foregoing, filed through the Electronic Case Filing System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that a paper copy shall be served upon those indicated as non-registered participants on February 7, 2025.

*/s/ Andrew J. Couture, Esq.*

Andrew J. Couture, Esq.
